the Army. If anyone is in the courtroom for the third argument of the morning, we're going to have to reconstitute the panel, so we'll be taking a break after this case. I just thought you might be interested in that. Anyone involved in U.S. v. McCain-Scott? But now we're going to hear Case No. 17-40259, Friends of Lydia Ann Channel v. United States May it please the Court, Michael Heidler, on behalf of Lydia Ann Channel Fleet. Your Honors, I'd like to cover three points in my presentation today. First, I'd like to address the District Court's finding that the plaintiff, and that's Friends of Lydia Ann Channel, or FLAC, has shown a substantial likelihood of prevailing on the claims under Section 9 of the Endangered Species Act to support a preliminary injunction against the business operations of Lydia Ann Channel Fleet. Second, I'd like to address the plaintiff's argument that this Court can affirm the preliminary injunction because we don't have a permit under Section 10 of the Rivers and Harbors Act. And third, if I have time remaining, I'd like to address the clearly erroneous fact findings that the District Court made as part of its public interest analysis. Now, on the first point, this Court held in the Aransas Project case that an injunction under the Endangered Species Act requires a showing of an imminent threat that is reasonably certain to occur. In this case, both the parties' experts have toured our facility, they've inspected the facility, and neither party's expert has found any evidence that this facility has ever caused any harm to a protected species. And in this case, we're talking about protected sea turtles. So have you finished the conservation protocol? Yes, Your Honor, we have. We have a protocol in place. There was a meeting on November the 10th, 2016, November 1st, 2016, where we've hired a Ph.D. biologist to design this protocol. The protocol is modeled after one that National Marine Fisheries uses in its projects looking for stranded sea turtles. And the protocol has now been implemented. There's an affidavit in the record signed on November the 10th laying out the protocol as adopted. Are they currently monitoring the sea turtles, or do they just wait until the weather gets cold? They wait until the weather gets cold. And given the posture of the case, the facts from the most recent winter aren't in the record. I'm happy to update the Court if you would like to know what happened, or if you want to keep that out of the case, I'm happy not to discuss it. Okay. So the record shows that we do have a protocol in place. And the district court found this imminent threat, this reasonably certain imminent threat, even though there's no evidence that we ever caused any harm to a protected sea turtle. Do you have a question? Okay. The district court made this finding based on crediting two theories of the plaintiff's expert, Mr. Moad. His first theory was that a barge might strike a turtle that is cold stunned in the water. And this cold stunning phenomenon is a biological phenomenon in which a cold-blooded animal, like a turtle, becomes physically incapacitated and unable to move when the water temperature spikes down to extremely cold levels. The record shows 50 degrees Fahrenheit or colder. And the cold stunning phenomenon is important in this case because the published literature cited in the record shows that turtles have excellent eyesight and excellent hearing, and they normally have no trouble moving away from these slow-moving barges. So Mr. Moad focuses on situations when the turtles just can't move because the water is too cold. But there's no imminent threat of harm to cold-stunned turtles in this case because the district court entered this preliminary injunction on March the 13th, 2017, one week before spring. I don't quite understand. I have two questions. Number one is about the turtles. And why would the turtles be residing in the Intracoastal Waterway to begin with? It's a major commercial transit area, and you've got bays, you've got the Gulf of Mexico, and so on. And so I'm somewhat interested in the incidence of turtles in this major commercial transit way to begin with. And my second question is, are you only saying that the district court's finding is infirm because at the time of the hearing it was no longer possible for the temperature to dip below 50 degrees? I'll answer the questions in the order you presented them. There is evidence in the record that there are turtles in the Lydia Ann Channel. The plaintiff's expert, Mr. Moad, says he has talked to the, there's a group that keeps track of the statistics of turtle stranding incidents, and he says he has those records. We asked him, did you supply those records to us? Did you put them in your report? He said no. But there is evidence that there are turtles in the channel. What the evidence shows is that the turtles like to inhabit the shallow water areas. That's where sunlight can get down and sea grasses can grow, and the turtles forage along the shorelines, which is one of the reasons why we started this project, because barges, as you see in the briefing, ground into the shorelines, and that's where the protected turtles are. To your question, Your Honor, there's not evidence of volume of turtles out inhabiting the industrial portion of the channel where all the barges are moving back and forth. And will you remind me of your second question? Second question is, is your challenge to the district court's findings limited to the fact that the hearing took place within days of the end of the period when it is at all likely that the water temperature could dip? In other words, are you at time limited? In other words, could they file their suit again or reinstitute their motion for injunction next November and you're back in the suit? We have not so limited our appellate argument. Our argument is, under Aranza's project, they have to show a harm that is both imminent and reasonably certain. So, on the imminence prong, there's no imminent threat because we're in these warm months, but they also fail the reasonable certainty prong. Remember, cold stunning doesn't even occur in a third of the winters. So in a third of the winters, there's no risk to cold stunned turtles. In the two-thirds of the winters, when cold stunning happens, it lasts only six to eight days on average. So that amounts to two to three percent of the year. So 97 percent, 98 percent of the year, there's categorically no risk of harm. In two to three percent of the year, there is a risk, but we laid out in our brief all the reasons why that risk is not reasonably certain to materialize and to harm to a turtle and why we mitigate that risk or how we mitigate that risk. We have the turtle monitors come to our facility and monitor the waters for cold stunned turtles during periods of cold stunning. What if they're in there? Are you going to shut down? Yes. If they find a cold... Has that been agreed to with the other side that sort of modified the injunction, but it would be your agreement that if the monitor said, oh, it's too cold, oh, there are turtles here, then you don't do the mooring for however many days. We have volunteered that. They have not taken us up on the offer. They don't want us here at all. They don't want the moorings there, right? They don't want the moorings here at all. So the turtles are an afterthought, you think? I do think. I think the turtles are an afterthought. We have volunteered. If the court deems it necessary, we don't think it's necessary, but if the court is concerned about cold stunned turtles, we would submit to an injunction during the few days per year when there's a possibility of a risk to cold stunned turtles. Again, we don't think it's necessary. Yes, Your Honor. So imminent is the fact that the weather's not, it's not cold enough, and reasonably certain is the fact that this is really not happening. Exactly. That's... Okay. I'm confused about something in the expert report that if the turtles attempt to flee by diving and run out of water and hit the bottom, there'll be an opportunity for a taking to occur. Is this saying that the barges don't kill them, but they'll die from hitting the bottom of the channel or something? What is the expert saying? I think the expert's saying a combination of those things. And let me back up and frame your question, if I may, for a minute. There's two risks that Mr. Moe had talked about. The risk of cold stunning turtles, and that risk is not imminent or reasonably certain. And then there's this risk to healthy turtles that are feeding on the moss or algae in our facility. And what he's saying, what your question goes to that second risk, and what he's saying is he sees an opportunity for a take, that was his word, an opportunity, if three things happen in sequence. If a turtle is feeding on moss or algae growing on one of these mooring dolphin structures as a barge comes into the facility to park, that's the first thing. Second, the turtle would have to flee by diving straight down, as you said. So if the turtle goes left, if the turtle goes right, if the turtle just retreats away, there's no risk. And third, the turtle, and it's an animal that lives in the water, would have to dive straight down and just smack into the bottom of the channel. And that's when he sees this opportunity for a take occurring. But opportunity doesn't mean imminent and reasonably certain. Your Honor, I couldn't agree more. He said opportunity. His focus was on cold stunning. This hearing happened on the eve of winter, and so people were worried about cold stunning. I think the turtles are an afterthought. I think harm to healthy turtles are an extreme afterthought. So there's no reasonably certain threat to these healthy turtles. The other problem with that theory is he went and toured our facility twice, their expert, in the days leading up to the hearing. I think two days before the hearing he went, he inspected, he went home. He came back the next day, inspected our facility. Now why is he doing this? He's looking for the most recent evidence he can use to testify against us about this threat to turtles. And then he shows up at the hearing and he acknowledges what we already know because we're there every day. The turtles aren't there. There aren't any turtles in our facility right now for the reason that Judge Jones gave. They don't like the industrial fleeting operations. Now they point to testimony or an opinion of our expert, Dr. Carruthers, where he said he toured the facility and he saw algae on a few of the boats. Those were his words, a few of the boats. And so on appeal, this is not what their expert said, on appeal their lawyers point to that opinion and say, well maybe turtles from out in the channel somewhere would want to come in and feed on the algae on a few of these boats. But no expert said that algae on a few of these transient boats would be enough to attract turtles into our facility. Their expert didn't say that. Our expert said maybe. We have an extremely credible expert. He looked at the situation. He said there's a possibility that algae on a few of these boats could bring turtles in. That's on page 15 of his report, but he flipped the page on page 16. He said turtles don't like the barges, so they may very well go east of the facility and just avoid the facility altogether. But whatever the potential attractants may be to bring turtles in, their expert has been to this facility multiple times and he's testified directly, unequivocally, that the turtles he's worried about are not currently there. So there's no reasonably certain threat of harm with this theory of the turtle diving down. There's also no imminent threat of harm because those turtles aren't even in our facility right now. Excuse me. How far is this fleeting facility from the Port Aransas ferry? Your Honor, I don't know the answer to that question. I'm told that ferries travel through the channel, but I don't know the distance. No, no, no. There's a ferry that goes from Aransas Pass to Port Aransas. That's the way the tourist travelers get over to the beaches. My kids keep reminding me we need to take it. I don't know how far it is. I do know there are all manner of watercraft in this channel. We service 15%. We know what the Intracoastal Waterway is. I was just trying to get a little closer bearing in my mind on exactly where the fleeting operation is located. What position, if any, do you take on the NEPA complaint? So the NEPA complaint that they've raised, it's not clear in their brief what exactly their theory is. If you look at the statement of the issue and you look at page 4, they say, we've just missed this glaring problem in the case that we don't have a permit under Section 10. Well, in the Bucare decision from this Court that we cite in our reply brief, this Court clearly held there's no private right of action to enforce Section 10 of the Rivers and Harbors Act. So some of the statements in their brief make it look like they're asking the Court to hold that private environmental plaintiffs can go around getting injunctions against businesses based on allegations that the business is violating Section 10. This Court has not allowed that. That's foreclosed by the Bucare decision. Now, some of the statements in their brief make it look like they're relying on a NEPA claim. Well, they have two different NEPA claims. One of them is more moot than any claim I've ever seen. It's a claim that the Corps of Engineers violated NEPA in authorizing this construction project that's now finished through a letter of permission that's now been revoked. So we don't think that claim has any bearing. They also have a claim that the Corps of Engineers should have exercised its enforcement authority to require us to stop operating. The APA doesn't allow review of that kind of a discretionary enforcement action. And they haven't really articulated the APA components of these theories. So I'm not sure what the basis for the theories is. And while the district court may have had a flavor of some of this in the opinion, the district court did not rely on this grounds. That's exactly right, Your Honor. So at best, wouldn't it, because it's so unclear what it is that the actual NEPA claim is, wouldn't it be better for that to go back to the district court if they believe they can articulate such a claim? That's our position. And part of the problem here is we're a private entity. So they haven't asserted a NEPA claim against us. They can't assert a NEPA claim against us. They can't get APA review of our decisions. So you agree to a remand to let Judge Jack hold this open, probably leave the injunction in place because the NEPA claim isn't moot, and then rule on that as soon as if the Army Corps does what you want them to do and grants a new permit? Or could we handle it? So our request is for the court to vacate the injunction because the basis for granting the injunction cited by Judge Jack is an invalid basis. That's our request. Our concern with the NEPA claim, there's a couple of them. One is they're not asserted against us, so we haven't really joined issue on the NEPA claims until the reply brief in this case. And there's a lot more development that we could do in the district court on those claims. We're also concerned that the Corps of Engineers is postured as an appellee here. And these claims allege wrongdoing by the Corps of Engineers. And if you read their brief, their brief is full of statements that the district court ruled only on the ESA claims against us, not on the — They're not taking a position because they think they're not really at this party, so — Exactly. But they would be taking a position had the district court ruled that they have a substantial likelihood of showing that the Corps of Engineers has violated Federal law. The Corps of Engineers would have filed a very different brief in this court. So we think the appropriate outcome is to vacate the injunction, and then if they want to tee up the NEPA claims, there's a — the Corps of Engineers is under the impression that the NEPA claims have been abandoned. They'll probably assert that argument. Our view is the NEPA claims are both moot and unripe and barred by the APA. I think that's laid out clearly in the briefing, and it's far be it for me to explain how I think the case should come down. So there wouldn't be any need to — you said more development before the district court, but if you're right about the NEPA claims, there would be no need for development. That's right. The development that — one of the areas of development that we're interested in is how has the Corps of Engineers construed its own regulations? We see how they've construed the regulations on the briefing, but we haven't done discovery on that issue as it would relate to agency deference. So there are some arguments that could potentially be made that haven't been — we don't have the record to support right now, but that's how we view the NEPA claims. So we think the injunction should be vacated because they haven't shown a substantial likelihood of prevailing on any of their claims. Thank you. Okay. Thank you. Mr. Lundman? Now you can answer his question. Yes. Good morning. May it please the Court. Robert Lundman representing the United States Army Corps of Engineers. As I think the Court realizes, the injunction is only against the mooring company. It's not against the Corps, so we have not taken a position on the propriety of the injunction. But I am here because we think a few things are important for this Court to understand. First, we think the stay of proceedings pending the Corps' review of the question of whether the dolphin moorings should be removed, if so, how they should be removed.  And also the mooring company's request to leave them in place. The Corps should be allowed... But since when does the district court have continuing jurisdiction over a case that might have, if the, you know, leave the injunction aside, just take the only thing that remains pending as a NEPA claim, right? Because they abandoned their other claims. We think they have two NEPA claims. We think their NEPA claim, based on the letter of permission, is moot. Because... Absolutely. Revoked, moorings in place. No, I don't think we'll see what they have to say about that, but it's certainly likely. So why can't... Since when can a petitioner come into court and say, I think the U.S. Army Corps is proceeding along in such a way that they're not going to do a NEPA on such and such a request for development or else they're going to do it wrong, and therefore, court, I'm filing this suit, and I want you to have jurisdiction until they rule? We don't think there's jurisdiction over that either. Our brief didn't address it. So then what basis is there to stay, which is what you were saying is okay? Well, there is a Section 9 claim against the mooring company, which was the basis for their likelihood of success on the merits. Well, you don't take a position on the injunction. So the injunction is the crux of the Section 9 complaint. So stay means nothing in that case. I think that's right. With respect to their NEPA claims, one of them is moot and one of them is premature. The Corps started a NEPA process and is underway. Asked for public comment. We cited the notice on that in our brief. So if we were to vacate the injunction, on what basis can the district court, quote, stay proceedings? If you vacated the injunction in a way that revealed that the merits of their ESA Section 9 claim against the mooring company had no legs, then the court should resolve this in summary judgment, grant summary judgment on that claim, and then there's nothing left that is properly before the court. If this court decides injunction should be vacated, we think the stay should remain in place pending the Corps' completion of the process, unless that Section 9 claim goes away, too, in which case then there's no proper claim left to support their suit. I still don't understand why you're arguing for the stay to remain in place. Well, at the eve of – when this appeal occurred, before the injunction occurred, there was about to be a trial. There's pending summary judgment motions. And we don't think a trial on any issue of what the Corps has done here makes any sense. It should be Administrative Procedure Act record review. So the stay alleviated that problem for us, that there was going to be a trial that potentially assessed claims against the Corps, and that's not right. Under the APA, reviews on the record, it's really clear, and … But you're not arguing they're entitled to a stay. No. I'm not arguing anyone's entitled to a stay. I'm just arguing that the stay allows the Corps to finish its process. And what the Corps submits should happen here is the Corps should go through what it's doing now, and we don't want a district court order that interferes with it. So again, any time somebody else comes in and says, we want to build something in that channel, and we're filing a Corps permit, and some group comes forward not liking that and files various complaints, they can get in a district court, and the district court can say, well, I have jurisdiction, but I'm going to stay the proceedings until the Corps does something. If the Corps hasn't done anything yet, the district court does not have jurisdiction. Isn't that the situation that we're in now? I'm not — yes. That is — with respect to the Corps, that's the situation we're in. I thought you said the process was underway. They haven't done anything. They haven't made an appealable — Underway. There's no final agency action. It's not right. There's no jurisdiction with respect to what the Corps is doing now. So you don't seek a stay? No. If what we're — the reason I addressed the stay in the brief was because we are — we think a trial against the Corps, as the district court had planned — Keep out of the trial court. Was wrong. Keep from trial. No trial. That's — that is the critical part of our position. I see I'm out of time. I'm happy to address any NEPA questions or anything else. Otherwise — You're out of time. I'm out of time. Thank you very much. Thank you. Mr. Baumgartner. May it please the Court. What Fleet proposes to do is vacate a district court injunction and thereby allow the use of indisputably unpermitted and therefore illegal structures. That is not the plaintiff saying it. That's the district court's conclusion. But it is also the Corps of Engineers' conclusion. Well, you know what? We all have — all of us on the bench have life, tenure, and status under Article III of the Constitution, but we just can't act because we don't like something. We have to act only if someone points to a violation of the law that we can adjudicate. Yes, Your Honor. It is well established, and I quote from the D.C. Circuit here, that judicial power to enforce NEPA extends to private parties where nonfederal action cannot lawfully begin or continue without prior approval of a federal agency. Were such nonfederal entities to act without the necessary federal approval, they obviously would be acting unlawfully and subject to injunction. The D.C. Circuit has said that in two cases. The Tenth Circuit has said it in Davis v. Mineta and Airport Neighbors Alliance. And what did this Court say in Vieux Carre? This Court said in Vieux Carre that the claim was not moot because no NEPA analysis whatsoever had been conducted. And that's these facts. Of course, the agency doesn't have to do NEPA analysis if it concludes that there's no significant environmental impact, correct? The agency in this case has already concluded that it must do the NEPA analysis. Excuse me. Let's start with your NEPA claim. The first one has to do with the permitting process to begin with. That permit has been vacated. That claim is moot. How can it not be moot? It cannot be moot because the activity that resulted from it and which causes all the harms is on the law that says that. I just quoted from the D.C. When a permit is vacated, there is no more permit the environment and the compliance of which with the Environmental Protection Act can be adjudicated. Let's take a step back for a moment, Your Honor. What I think the district court's injunction does is rule on this, by the way, I think she did rule on it in all of the elements other than she did not put it in, admittedly, in likelihood of success on the merits. She used the NEPA concepts in every other aspect of her order, and it was fully briefed and fully argued in the hearing. Well, I know it was argued, but it looked to me as if the injunction was predicated on the taking of sea turtles. It was on the likelihood of success on the merits analysis alone. I'm not sure why the district court did that, especially where, as here, it was so clear that the NEPA analysis that is required to be done, according to the Corps of Engineers, concerns the scope of the operations, the massive, full-scale fleeting operations that have never undergone any NEPA review at all. So you have one permit that's been vacated, and you have another permitting process that is currently underway with no final reviewable agency action, and also no environmental impact statement for us to review. Correct. That claim is not right. That's not right. Admittedly, yes. And that was not the basis for the district court's injunction. The basis for the district court's injunction, and I guess we call this NEPA facts, is that the fleeting company is operating illegally. And I quote from the Corps of Engineers' statement of findings in revoking the permit. Revocation of the LOP means that the mooring dolphins constructed by LAC Fleet pursuant to the LOP are no longer authorized and constitute obstructions in violations of 33 U.S.C. Section 403. Well, let me clarify this, then. Are you — I mean, your brief certainly said this, and I just want you to make our job easier, or at least more clear. You are not defending the district court's ruling on the Endangered Species Act. Is that correct? Absolutely incorrect, Your Honor. The district court's finding — We only spent about five pages of that in a 50-some-page, 60-page brief. I don't recall. I take the court's word for it. I don't recall the number of pages. But the point is there's clear factual basis for the district court finding here. And what the — Most lawyers would say, hmm, that's the basis the court ruled on. No clearly erroneous fact-finding, QED, we win. I think we have said that. But you didn't do that. With respect, Your Honor, we certainly did. The district court did not make a clear fact-finding error. It took — it did its job in weighing competing expert testimony on the impacts to sea turtles and using its discretion to weigh one competing — one expert's testimony over the other. The expert that it credited has 30-some-odd years of experience and is, in fact, sometimes hired for Endangered Species Act analysis by the fleet's expert. Let me ask you, forget the turtles, all right? If there were no turtles, would the Friends of the Channel still have an objection to what you refer to as a massive mooring operation? Yes, of course, Your Honor. And why? And that's because there was a clear violation of NEPA in the issuance of the permit. That's been acknowledged by the Corps of Engineers when it told the district court that was an inappropriate process. And the — But weren't the barges moored on the — on the banks before the moorings were? Not anything like a fleeting facility does. And that's — that's the — That's the main objection, right? Not the turtles. Well, I think both are — both are clearly at issue. One is the — Why do you — why? Is it a matter of clearance or just too much congestion? Or is there a competitive factor here? Do the Friends have a mooring facility? I'm trying to figure out — Oh, no. — why you care. The Friends of Lydianne Channel are local residents, outdoors men and women, sportsmen and women, hunters, people who have used — recreated and used that — that Lydianne Channel, a state scientific area, a highly sensitive environmental area that — So they don't want all these barges there. Oh, of course not. These barges create massive — What I don't understand is, though, you have the intercoastal waterway there. How many barges per day are traversing the intercoastal waterway and vessels of all kinds? The Lydianne Channel is a naturally occurring alternate route within the Gulf Intercoastal Waterway. But this is not what the fleeting facility that's — It's 1,200, 1,300 feet wide, right? The — yes. I mean, just — just a few yards off the edge of it, it's more than 12 feet deep. I mean, it's — it's not a little tiny thing, and — Correct. Right. And barges do come through there. Ships come through there. And what they don't do, and what they are doing only illegally after the permit was revoked, was fleeting at a massive scale that was never permitted. How many barges do they fleet out from the shoreline? Well, the permit, and one of the reasons why it was revoked, allowed four per — four deep, essentially. And then the fleeting companies started mooring them 12 deep. And the reason kind of gets to the rub of the case and the reason why they lost their temporary matter before they gain a berth at the port of Corpus Christi three hours away, what they're doing is housing them there, taking them into custody with all their chemicals, with all their oil drums, with their frac sounds, with the cleaning agents, and stacking them 12 deep, unpermitted, and keeping them there for days at a time, as many as 10 days at a time. But they can unload, right? Oh, until — until they're fully serviced, until they complete whatever fleeting services, which the court has never reviewed the NEPA impacts of at all. It's doing that right now. And so all this — all the injunction did was say, okay, in light of the fact that your — What's your best case saying that you, as a private group, have standing to enjoin the operation of another private group because the Army Corps didn't comply with NEPA? What is your best case? The — the D.C. Circuit cases that I recited to the Court earlier, Foundation on Economic Trends v. Heckler, 756, F. 2nd, 143, Sierra Club v. Army Corps of Engineers, 803, F. 3D, D.C. Circuit 2015 — sorry, F. 3D at 43, Davis v. Minetta, Airport Neighbors Alliance, all of those cases, all of them recognized the Court's sound equitable authority to enjoin unpermitted and, therefore, illegally operating activity where the NEPA process has not been done at all. And the NEPA process — this is perhaps the strongest case imaginable for such a claim because in all of those cases, what the courts had to do was find a likelihood of success on NEPA. But the — I think the situation is this, though, because the — I mean, if it were so clear-cut as that, again, you didn't have to put all the focus on the sea turtles in your hearings. But here you have — a permit was in existence, you filed suit, the court took a step back, within a couple months, the court said, we're going to review this, right? Correct. Why aren't you winning at that point? Because the activity that causes all the harms never stopped because Fleet continued its operations utterly unpermitted and illegally. I thought that because of the injunction, they have stopped their operations. Correct. And that's why the district court's injunction is sound. It's a sound exercise of its discretion to enjoin illegal, unpermitted activity that has undergone no NEPA process. But the Army Corps, proceeding according to its established and, you know, legally cognizable procedures, said, revoke that permit. Correct. And the only people you can enjoin at this point is the private entity. But NEPA doesn't provide a ground to enjoin a private entity. With respect, Your Honor, I disagree. I've recited several cases saying that courts clearly lack — clearly have the equitable authority to enjoin third-party conduct that was permitted by a flawed NEPA process, which we have established in the record in this case. By the — and I urge the Court to read carefully the statement of findings the Corps issued in revoking the permit. But let's take a further step back, because I think it's important to talk about the NEPA policy and the proper order of things as they would normally occur if not for the gross misrepresentations and misstatements made by the Fleet in obtaining their permit initially. And those misstatements led to the revocation, as the Corps found, stating 9 or 10 times that it's the scope of activity that requires a NEPA review, that creates all the impacts, that causes, as the district court found, the harms, the irreparable harms to the plaintiffs. What were their misstatements? Their misstatements were that they were providing a mere alternative for barge parking while awaiting a berth at the port. As opposed to storage. As opposed to full-service fleeting for days at a time and stacking three times as many barges at a time. And so what this Court would do if it were to vacate the injunction is reward that bad conduct. It would tell honest brokers, people who try to apply for the permits using honest information, truthful disclosures about the scope of their operations that would allow the Court to conduct a NEPA review with the right information. And here, the Corps found, and I quote, the misrepresentations had a profound effect on the Corps' scope of analysis and are sufficient to revoke the LOP. It's against that factual backdrop that the district court enjoined the activities that are now undergoing the NEPA review. And against that factual backdrop, which Fleet asked this Court to, in effect, granted an interim permit while the Corps conducts its review. And the argument that you're correct, that the D.C. Circuit would allow these injunctions against the third parties under NEPA, let's just assume arguendo that, doesn't our precedent foreclose it, nonetheless? I don't think so, Your Honor. The mootness. And a rapid transit authority case from 1981, for example, that's citing an opposing counsel's brief. No, Your Honor. In those cases where the harm stemmed merely from construction, and I think this is the rub of the Fleet's argument and why it's wrong, they say we only needed a construction permit. Absolutely false. The Rivers and Harbors Act, of course, prohibits structures or obstructions. And as the Corps of Engineers has found, this is now an illegal obstruction and structure in the navigable waters of the United States because it lacks a permit. So, but here all the harms, all the environmental harms that require the NEPA review before they're supposed to begin, before they're supposed to begin, that's the key concept here, occur because of the operations, the massive scope of the operations. It's not the merely tethering of the, it's not the pilings in the ground. It's not the putting the pilings in the ground. It's the harms to the sea turtles that occur from the fleeting operations. The sea turtles are, as both experts acknowledge, attracted to algae growth on and around the facility, on the boats and structures. Do we have any authority in this circuit that would so cabin our authority from 1981? The Vieux Carre case, I think, is a case where, but the key distinction there is that there was no NEPA analysis done at all, so the claim wasn't moot. And that's the same fact here. There was no NEPA analysis because of the misrepresentations. There was no NEPA analysis done of the activity. And the Corps said that repeatedly in revoking the permit. Another case that I would commend to the Court is the Eighth Circuit case that we've said in our brief, Sierra Club versus U.S. Army Corps of Engineers, where ongoing fill activities can be enjoined. But again, each of those cases is so-and-so versus Army Corps of Engineers. Because that is the object of the injunction. And those cases enjoined private party activities because they were unpermitted and thereby illegal. Or that's our case. That's a stronger case than what those cases found. Those cases found that there was a likelihood that there was a NEPA violation that occurred. Here, we haven't acknowledged a NEPA violation. Didn't the district court err in its public interest analysis by relying on the Sierra Club case that you just cited to us in the way that it did? That's not how public interest analysis works in this circuit. I think that's a fair point, Your Honor. I think that the D.C. Circuit case there was really discussing mootness and the propriety of hiding behind, you know, a already-completed project when it was the result of an improper process. So I think it was the gist of what the district court was saying. It probably wasn't in the right spot. But as to public interest and balancing of the harms, Fleet has a very weak argument here. It says we're going to lose our investment and we're necessary to provide barge fleeting. While barge operations have tailed off dramatically, that's established in the record. There is no pressing need for them to occur. I mean, there's an argument to be made whenever anybody is an investor or entrepreneur that's put money into a project in the United States. So you can't just say, you know, just wave that away. You do have to balance it. Sure. With the other considerations. And here, there's no evidence of the economic harm from the enjoyment of its daily operations. But there were 29 employees that are no longer employed. That's not established in the record. On cross-examination, that witness acknowledged that some of those — God, I know it. It's somewhere. It's in the briefs. I mean, it's — They've said that, but they're wrong. Those 29 employees work not just for the fleeting company. Some of them at least work for a different — Still employed? A different — I don't know. They didn't put that evidence in the record, Your Honor. Okay. I see that I'm out of time. Thank you very much. Mr. Heidler. Thank you, Your Honor. Your Honor, it's the letter of permission from the Corps of Engineers. It's at tab 6 of my record excerpts. The first two sentences say, This is in reference to your request dated June 9, 2014. And here's the key language. To construct a fleeting area. Your request is approved by this letter of permission. The Corps of Engineers approved our request to construct — not to operate, to construct — and to construct a fleeting area, not a mooring area. Well, they don't have the right to give operational permits, do they? They don't have the right to give operational permits. They issue construction permits. And that's not just what the statute says. That's not just what the regulation says. That's not just what we say. That's how the Corps of Engineers interprets its own jurisdiction. They permit the structure. They don't permit the operations. So they permitted these structures, and they permitted a fleeting facility. The other side says, We made these misrepresentations during the permitting process, we did not make any misrepresentations. The Corps of Engineers knew exactly what it was doing. What the Corps of Engineers said — They're complaining about the number of barges being fleeted out. They're saying you did it at 12. They're saying we did it at 12. So we have made mistakes. And I want to be clear with the Court about that. One of the mistakes we made is for a couple of weeks when we had only some piles in place, we moored 12 wide. We don't do it anymore. And if somebody wants to enjoin us for, You can't moor 12 wide, we're fine with that. We don't do that anymore. So they talk about this full-service fleeting operation. The record doesn't show any difference between full-service fleeting — it's a term they like to use — and just regular fleeting. The record shows that fleeting involves barges parking for days at a time. There are tug crews, there are barge crews, and the industry practices, those people need food. They need transportation. And we never thought that giving a sandwich to the barge crews would cause this much turmoil. The people are staying with — They need fuel. We give them fuel. The Corps of Engineers permitted a fleeting facility, and that's all we've done. On these misrepresentations, on page 19 and 20 of their brief, they list all these bad things that they say the Corps of Engineers said about us. They have snippets from the Corps of Engineers revocation letter and findings with all of this editorial embellishment that their lawyers have done. The Corps of Engineers never said we misrepresented anything. What they said is the stated purpose and need for our project didn't accurately reflect what we did. And that's carefully worded language. The stated purpose and need refers to item 19 in our initial permit application. The Corps of Engineers never said that over the course of the seven-month permitting process, we failed to disclose any material fact or made any material misstatement. What they're saying is — What did item 19 say? 19 has a few snippets of text. It says we want to do mooring, we want to do fleeting, we want to protect the seagrass, we want to have a spill safety plan. And it doesn't go into detail about all these services. So what the Corps is saying is all of these other disclosures you made during the permitting process, you should have put in item 19 because the Corps of Engineers internally uses item 19 to determine the scope of review for the permit and to coordinate with other agencies. So there was a miscommunication between us and the Corps. That doesn't mean we misrepresented anything. Why do those D.C. cases not support the possibility of an injunction? For a couple of reasons. They have not cited a single case in which an appellate court affirms an injunction against a completed facility. They have cases where appellate courts talk about it, and they have cases where there's an injunction issued while a project is in development. The cases from this Court, the Springer case, the Bayou Liberty case, the Richland Park Homeowners Association case, Florida Wildlife Federation, all hold that once the facility is complete, there's no more NEPA injunction to be given. Now, they say those cases are talking about construction only. They're not talking about construction and operation. Completely incorrect. Look at the Springer case, Springer v. U.S. Marshall. The claim there was a NEPA violation in the approval of the project, and now the project is complete. Court, we want you to enjoin the operation of the facility. And this Court said, wait a second. That project's complete. How do we enjoin operation of the facility? What good is that going to do under NEPA? The claim is moot. And the claim is moot not only because the project is finished, but also because the letter of permission they're challenging has been revoked. I think I heard him say that they're only relying on their count one NEPA claim. They have two NEPA claims. One is the Court should make a stop operating now. The other NEPA claim is the letter of permission was invalid. I think I heard him say on appeal they're relying only on their count one NEPA claim. That's the claim that's completely moot. That claim doesn't have any legs at all. So I don't think there's a basis to affirm under NEPA. In his argument, he said we're asking the Court to allow us to operate without a permit. They need to show a substantial likelihood of success on the merits to get a preliminary injunction. Judge Jones, I think this was your point. They have to show a substantial likelihood of success. Under the VOOC RA case, they don't have a private cause of action to enforce Section 10 of the Rivers and Harbors Act. That is the Corps' job. And the Corps has enforcement authority. The Corps has discretion. And the Corps can enforce Section 10 as it sees fit. It's not for private environmental plaintiffs to go around enjoining businesses. The Corps chooses, has chosen to work with us and allow the moorings to stay in place knowing that we're operating while the Corps reviews our permit application and our removal alternatives. They will make a decision. They haven't done so yet. That's the amount of time we'd ask the Court to vacate the injunction, if there are no more questions. Thank you, sir. Thank you. The Court will stand in recess until the panel is finished.